924 So.2d 303 (2006)
STATE of Louisiana
v.
Chris J. POLIZZI.
No. 05-KA-478.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
*305 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Desiree M. Valenti, *306 Jackie Maloney, Paige J. Cline, Assistant District Attorney, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SAM A. LeBLANC, III, Pro Tempore.
JAMES L. CANNELLA, Judge.
The Defendant, Chris Polizzi, appeals from his conviction of forcible rape of a juvenile and oral sexual battery of a juvenile and his respective sentences of imprisonment at hard labor of 25 years, two without benefit of parole, probation or suspension of sentence, and 10 years, without benefit of parole, probation or suspension of sentence, to be served concurrently. For the reasons which follow, we affirm the convictions and sentences and remand.
The Jefferson Parish District Attorney filed a bill of information charging the Defendant with forcible rape of a juvenile in violation of La. R.S. 14:42.1 and oral sexual battery of a juvenile in violation of La. R.S. 14:43.3. The Defendant pled not guilty at arraignment. The Defendant proceeded to trial before a 12 person jury on December 15 and 16, 2004. The Defendant was found guilty as charged. He was sentenced on January 6, 2005.
In June of 2003, the victim, 14-year-old A.R.[1], lived at 769 Avenue C in Westwego. On June 18, 2003, she spent the night at the house next door, 765 Avenue C, where Michelle Gisclair (Gisclair), Timmy Adams (Adams), and Melissa and David Trepagnier (Melissa and David) lived. The Defendant, who was 59-years-old at the time of trial, had been staying at the neighboring house.
At 1:16 p.m. on June 19, 2003, Officer Terry Fourcade of the Westwego Police Department went to A.R.'s house in response to a reported rape. When he went inside the house, he discovered A.R. sitting on a couch between a woman and a man, whom Officer Fourcade assumed were the parents. A.R. was crying and both adults were doing most of the talking. The adults told Officer Fourcade that A.R. had told them that the Defendant had sexually assaulted her on the previous night at 765 Avenue C. Officer Fourcade asked A.R. if this is what had happened and she replied affirmatively. Officer Fourcade immediately notified his supervisor of the situation.
When he went next door, Officer Fourcade saw the Defendant outside smoking a cigarette. He was in the process of taking bags of clothing from 765 Avenue C and placing them into his vehicle. The Defendant told Officer Fourcade that he was going to leave. Officer Fourcade told the Defendant that he was under investigation and placed him in the rear of the police unit.
At approximately, 1:27 p.m., Detective Edward Beyerback arrived and interviewed A.R. According to Detective Beyerback's supplemental report, which was introduced into evidence at trial and published to the jury, A.R. told him that on June 18, 2003, she was visiting with her neighbors, Gisclair and Adams. They were playing darts before going to bed. A.R. went to sleep on the sofa in the front room. At approximately 11:00 p.m., the Defendant, who was sleeping on a mattress on the floor in that room, woke *307 up A.R. and told her to wash herself. She went to the bathroom and, upon returning, she observed the Defendant kneeling on the mattress wearing nothing but a condom on his penis. A.R. said that she lay down on the sofa, but the Defendant picked her up and brought her to the mattress. He touched her all over and removed her clothing. A.R. told the Defendant to stop, but he refused and then had vaginal intercourse with her. The Defendant then turned her over and inserted his penis into her rectum, but stopped when she said it hurt. Then, he started vaginal intercourse again, and then performed oral sex on her. When he was finished, A.R. went back to sleep on the sofa. She said that the incident lasted approximately three hours. The next morning, A.R. showered and then went fishing with Gisclair, Adams, Melissa and David. While fishing, A.R. told Melissa what had happened the night before. The adults then brought the victim home and A.R.'s mother was informed.
After Detective Beyerback interviewed A.R. and her mother, he and Officer Fourcade went next door, took photographs and collected evidence. Detective Beyerback described the house as basically a shotgun house, with a living room, followed by a bedroom, followed by either a bathroom or another bedroom, with the kitchen in the very back. There was a doorway, with no door, separating the front bedroom from the living room. Detective Beyerback interviewed David, who said that he and his wife were sleeping in the bedroom next to the living room. He heard a noise during the night, but thought it was his infant son moving about in the bed, which was next to his bed. When he looked at his son, the child was sleeping soundly. David went back to sleep and his wife did not waken.
Detective Beyerback asked A.R. and her mother to meet him at his office and he transported the Defendant to the police department. A knife blade disguised as a belt buckle was found on the Defendant's person during booking. The Defendant refused to give a statement. Detective Beyerback again interviewed A.R. and obtained a tape recorded statement. Thereafter, A.R. and her mother went to Children's Hospital, where she was seen in the emergency room by Dr. Maria Treme, a pediatrician. A.R. told Dr. Treme what had happened to her. Dr. Treme performed a rape examination and swabbed the victim's internal and external genitals for the rape kit. Dr. Treme said that the genital examination was normal and she found no visible injuries on A.R.'s body. According to Dr. Treme, A.R. seemed numb and sad. A.R. told Dr. Treme that a friend of the family had abused her at different times between ages 9 and 12.
A.R. was interviewed by Omalee Gordon (Gordon) on June 23, 2003 at the Jefferson Parish Children's Advocacy Center. At trial, A.R. testified that she remembered being interviewed by Gordon. A videotape of this interview was introduced into evidence and played for the jury without objection. The videotaped interview is very similar to A.R.'s account of the events contained in Detective Beyerback's supplemental report. There are some differences between the two accounts. In the videotape, A.R. additionally mentioned that after the Defendant had sex with her, he removed the condom and wanted her to suck his "private." A.R. said that she refused. Afterwards, A.R. went to sleep on the couch. A.R. said that she had forgotten to tell the detective about this. She described the Defendant as "big" and "old." A.R. also said that the Defendant had touched her twice on her "bottom part" at a lake in Mississippi when she had gone swimming with him, Gisclair, and Adams about one month before this incident.
*308 After the videotape was played, A.R. was questioned about the incident. She said that she had limited independent memory of the events because the social worker had told her to forget everything. A.R. testified that the Defendant was Gisclair's friend and she had known him two to three months. A.R. testified that she was spending the night at Gisclair's house because they were going fishing the next day. A.R. testified that she never told the Defendant that it was alright for him to have sex with her. A.R. testified that although there were four other people in the house, she was afraid to call out to them. She repeatedly testified that she was afraid.
When asked what she thought the Defendant meant by asking her to clean herself, A.R. replied that she guessed the Defendant "didn't want to get no disease or something." When asked what she thought when she saw the Defendant wearing nothing but a condom, A.R. testified that she believed that he wanted to have sex with her. A.R. said that she didn't tell the Defendant anything when he picked her up off of the sofa, and that she didn't tell the Defendant "no" when he began to have sex with her. A.R. said that she believed he would hurt her if she had said "no" or if she had fought with him, because he looked like a mean person. A.R. said he always wore a knife that was connected to his pocket. He did not threaten her or show her a knife and she did not know if he was wearing the knife that night. A.R. testified that he told her not to tell anyone. According to A.R., this was not the first time anything like this ever happened to her. A.R. testified that it had happened before with a person named Allen LeBlanc.
On July 1, 2003, the victim was examined and interviewed by Dr. Ellie Wetsman, an expert in the field of child sexual abuse and pediatrics, at the Child Care Center at Children's Hospital. A.R. related what happened to her and the interview with Dr. Wetsman was taped. Dr. Wetsman testified that A.R. was taking Paxil and had previously attempted suicide four times. Dr. Wetsman's report and the audiotape recorded interview were introduced into evidence.
The rape kit containing the samples collected by Dr. Treme was tested by Pam Williams (Williams), a forensic scientist in the Jefferson Parish Sheriff's Office. However, no seminal fluid was detected. The samples were then sent to ReliaGene, a private deoxyribonucleic acid (DNA) testing facility, where the genital swab was submitted to Y chromosome Short Tandem Repeat (YSTR) DNA testing. According to Gina Pineda (Pineda), an expert forensic DNA analyst at ReliaGene, YSTR testing is a specialized type of DNA testing that is done when there is a mixed sample containing male and female DNA. YSTR tests DNA found only on the Y chromosome, which is found only in males, and which is inherited by male descendants. In other words, a grandfather, father, son, et cetera, will all have the same YSTR profile. Pineda compared the DNA profile of the male donor in the genital swab with the DNA profile from the Defendant's buccal swab.[2] Pineda concluded that the two profiles were consistent with each other, meaning that the Defendant or any of his paternal relatives could not be excluded as having been a donor to the sample from the victim. According to Pineda, 99.7 percent of the Caucasian population, 99.8 percent of the African American population, and 99.3 *309 percent of the Hispanic population could be excluded as donors of the DNA in the sample.[3]
The Defendant testified on his own behalf. He said that he had been living with Adams and Gisclair, who were renting the house, for two months. According to the Defendant, A.R. slept on the mattress the night before, which was Monday night, and he slept on the couch. On the night in question, Tuesday night, the Defendant said that he played darts with Adams and Gisclair at a lounge on Belle Chasse Highway from 7:00 p.m. until about 12:30 or 1:00 a.m. The Defendant said that Melissa and David stayed home. The Defendant said that he was very drunk and that he had nine or ten beers and three shots. A.R. was sleeping on the sofa and the Defendant passed out on the mattress on the floor. The Defendant said that Adams awakened A.R. to play darts in their bedroom and asked the Defendant to play too. However, the Defendant said that he was too sleepy. The next morning, he awakened around 9:00 a.m. and everybody was outside sitting on the front porch. They were all going fishing. When they returned, A.R.'s mother came over screaming at him and then the police showed up. The Defendant denied that he was trying to leave when Officer Fourcade arrived.
When asked whether he had "any contact" with A.R., the Defendant replied that he "wouldn't have known if he had contact with God Almighty. I was drunk. I don't know. I don't think so." The Defendant also said, "I was too drunk to even comprehend what I was doing . . . I really couldn't hurt her, you know. I didn't know what I was doing up in there." The Defendant denied that he raped A.R. or did anything else she had alleged. He speculated that A.R. had made up the events because she was angry with him for not taking her fishing in his boat.
The Defendant acknowledged that A.R. told Gisclair that he put his hand on her behind when swimming at the lake. The Defendant said he wanted to tell A.R.'s mother, but said Gisclair told him to just let it go. He denied touching A.R. inappropriately and said that they were just throwing the kids around in the water. The Defendant said he had four children and ten grandchildren.
The Defendant acknowledged that he had subpoenaed Allen LeBlanc (LeBlanc). He said he had no idea why his lawyer decided not to call LeBlanc to testify. He also had no idea how his DNA ended up on A.R.'s genitals. He speculated that A.R. must have picked up his DNA from the toilet or the couch where he had been sleeping. The Defendant admitted to two prior convictions, one involving migratory birds in 1967 and for selling vicodin in 1987.
Upon completion of the trial, the jury found the Defendant guilty as charged. On January 6, 2004, the trial judge sentenced the Defendant to 25 years imprisonment at hard labor for forcible rape, with the first two years to be served without benefit of probation, parole or suspension of sentence, and 10 years imprisonment at hard labor for oral sexual battery, to be served without benefit of probation, parole or suspension of sentence. The trial judge ordered the sentences to be served concurrently with each other. This timely appeal follows.[4]

*310 ASSIGNMENT OF ERROR NUMBER ONE[5]
By this assignment of error the Defendant argues that the evidence was not sufficient to support the jury's finding that he was guilty of forcible rape and oral sexual battery. The Defendant bases his argument on the contention that A.R.'s testimony was not credible and there was no physical evidence to prove that he had sexual contact with her. The Defendant additionally contends that the evidence, even if believed by the jury, failed to establish the essential element of forcible rape, that is, that the victim was prevented from resisting by force or threats.
The State contends that A.R.'s testimony alone was sufficient to establish the elements of both offenses. Moreover, there was physical evidence that corroborated the testimony.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181 (La.App. 5th Cir.6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
Forcible rape is defined in La. R.S. 14:42.1, in pertinent part, as follows:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
. . .
Oral sexual battery is defined in La. R.S. 14:43.3 in pertinent part, as follows:
A. Oral sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender when the other person has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.
B. Lack of knowledge of the victim's age shall not be a defense.

*311 . . .
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Robinson, 02-1869 (La.4/14/04), 874 So.2d 66, 79, cert. denied, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004). In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and writ denied, 00-0150 (La.6/30/00), 765 So.2d 1066. See, State v. Tapps, 02-0547 (La.App. 5th Cir.10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789, where this Court held that the juvenile victim's testimony alone, even absent any additional physical evidence, was sufficient to establish the elements of the offense of forcible rape.
In support of his argument that A.R.'s testimony should not have been believed, the Defendant asserts that she had little memory of the event at trial and that she had given differing versions of the events. There are some differences in A.R.'s testimony and her earlier accounts. For instance, at trial, A.R. testified that the Defendant kept his "bottom part" in her "bottom part" for about ten minutes, while she said she did not recall telling the officer that it lasted for hours. Additionally, Detective Beyerback's statement reflects that she repeatedly told the Defendant to stop, while A.R.'s videotaped statement indicates that she only told him to stop when he penetrated her from behind. A.R. also said that she did not recall telling the police officer that the Defendant told her to wash herself. However, A.R. explained that she did not remember a lot of things about the night of the incident because the social worker told her to forget everything. A.R. said that she remembered bits and pieces of the incident. A.R. said that she recalled that the Defendant picked her up and placed her on his mattress. Although she had difficulty at trial recalling all of the events of that night, a review of the interviews given to Dr. Wetsman, Gordon, Detective Beyerback and Dr. Treme are very similar. Further, Dr. Wetsman found A.R.'s account of the events to be a "clear and detailed history of penile-vaginal, penileanal, and attempted penile-oral penetration as well as oral vaginal contact by her neighbor's `paw-paw' Chris Polizzi."
The Defendant contends that A.R. previously made unsubstantiated allegations of sexual assault against another man. However, there was no evidence presented at trial to support the Defendant's position that these allegations were unsubstantiated.
The Defendant also contends that the DNA evidence does not prove sexual contact because his DNA could have been transferred from a towel used by A.R. after the Defendant, from the toilet, or from the couch where the Defendant had previously slept. At trial, Pineda, the DNA expert, acknowledged that it was possible to transfer DNA from one person to another by touching a person's clothing or by placing the clothing of two people together in a bag. However, Pineda explained that it would depend on a lot of factors, including whether the person shed a lot of skin cells. Pineda further acknowledged the possibility that the Defendant's DNA could be transferred to A.R. if she took a shower and used a towel that had been used by the Defendant. However, *312 Pineda said the transfer of DNA to A.R. would depend on a lot of factors, including what part of the towel she used and how much DNA the Defendant had left on towel.
While the Defendant essentially discounts the DNA evidence because of this testimony, there is no evidence that the Defendant's DNA was found on the couch, the towel or the toilet. In fact, A.R. said that she was not sure what towel she used after bathing the next morning, and the Defendant said that he did not believe that he used the towel that was found near A.R.'s swimsuit in the living room. Therefore, even though the DNA expert acknowledged the possibility of transferring DNA, the evidence does not support the theory that the Defendant's DNA ended up on A.R.'s vagina by coming into contact with an object which the Defendant had touched.
In this case, the testimony of A.R. and that of the Defendant were in direct conflict. When faced with the conflict, the jury obviously chose to believe A.R. It is the role of the factfinder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Wallace, 00-1745 (La.App. 5th Cir.5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be upheld. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473, 479. A careful review of the record reflects that the jury's decision to believe the victim's account of the events over the Defendant's explanation was not irrational.
Further, the evidence established all of the elements of oral sexual battery. The victim was under age 15, she was more than three years younger than the Defendant, she testified that his tongue touched her genitals, and his DNA was found on her genitals.
Next, the Defendant contends that the evidence, even if believed, does not prove forcible rape because there was no evidence that A.R. was prevented from resisting by force or threats.
In a similar case, State v. Wright, 598 So.2d 561, 565, (La.App. 4th Cir.1992), writ denied, 93-2502 (La.3/22/96), 669 So.2d 1227; writ denied 98-1474 (La.10/16/98), 726 So.2d 410, our brethren on the Fourth Circuit affirmed the forcible rape conviction where the evidence showed the 13-year-old victim was prevented by force or threats from resisting sexual intercourse based on the victim's testimony that she considered the defendant to be an adult and not a playmate, that she was told by defendant to accompany him to another room, that the defendant touched and kissed her all over, that he attempted to raise her clothes, that he climbed on top of her and held her arms over her head. The victim also testified that the defendant told her to stop moving, that she was angering him when she attempted to push him away, and that she was too scared to fight the defendant.
The Wright court cited a case by this Court in support of its conclusion, State v. Hawkins, 504 So.2d 1132, 1133 (La.App. 5th Cir.1987). In Hawkins, the defendant was convicted of forcible rape, primarily on the testimony of his 13-year-old victim. The victim testified that the defendant forced him to go inside of the defendant's apartment where, the defendant locked the door, undressed the youth, and sodomized him. Trial testimony revealed that the victim was afraid, tried to escape, but *313 couldn't move because the defendant was on top of him. He also testified that he did not encourage the defendant or consent to the act.
In State v. Wright, supra, the court pointed out that the evidence regarding the element of force and the subjective state of mind of the victim, as in Hawkins, when viewed together with all of the other evidence, was sufficient to support the defendants' convictions of forcible rape. Id. at 565.
In the instant case, the Defendant, whom A.R. referred to as her neighbor's paw-paw, used his position of authority and his size to accomplish sexual intercourse with her.[6] A.R. knew the Defendant carried a knife on his person and in fact, a knife disguised as a belt buckle was found on him during booking. A.R. repeatedly said that she was afraid of the Defendant. Further, her statement to Detective Beyerback indicates that she repeatedly told the Defendant to stop, to no avail. Viewed in the light most favorable to the prosecution, we find that the State proved the essential elements of forcible rape beyond a reasonable doubt. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error the Defendant argues that the trial court imposed an excessive sentence. The Defendant contends that his sentences are excessive because of his age, his lack of an extensive criminal record, and because A.R.'s testimony was unreliable. The State responds, to the contrary, that the record supports the sentences.
In this case, the Defendant did not make or file a motion to reconsider the sentences or object to the sentences. This Court has recognized that the failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Pendelton, 00-1211 (La.App. 5th Cir.3/14/01), 783 So.2d 459, 465, writ denied, 01-1242 (La.1/25/02), 807 So.2d 243. Accordingly, we review the sentences for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive, even if it is within the statutory limits, if it is grossly disproportionate to the severity of the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La.1992).
In reviewing a sentence for excessiveness, the reviewing court must consider the crime and the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice, recognizing at the same time the wide discretion afforded the trial judge in determining and imposing the sentence. State v. Allen, 03-1205 (La.App. 5th Cir.2/23/04), 868 So.2d 877, 879.
In reviewing a trial court's sentencing discretion, three factors are considered: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Allen, supra. The trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed, even when the trial judge does not provide reasons for the sentence. State v. Uloho, *314 04-55 (La.App. 5th Cir.5/26/04), 875 So.2d 918, 933, writ denied, 04-1640 (La.11/19/04), 888 So.2d 192.
Oral sexual battery is punishable by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than 10 years.[7] La. R.S. 14:43.3(C). Forcible rape carries a possible sentence of 40 years imprisonment at hard labor, at least two years of which must be without benefit of probation, parole, or suspension of sentence. La. R.S. 14:42.1(B).
While it appears this is the Defendant's first conviction for a sex offense, the Defendant has two prior convictions, which he admitted at trial. The evidence shows that the Defendant, who was 59 at the time of trial, used his age and position of authority to sexually assault the victim in multiple ways. While he received the maximum sentence for oral sexual battery, he received a mid-range sentence of 25 years for forcible rape and the sentences were ordered to run concurrently. In reviewing other cases we find that similarly situated defendants have received similar sentences.
In State v. Williams, 98-1146 (La.App. 5th Cir.6/1/99), 738 So.2d 640, writ denied, 99-1984 (La.1/7/00), 752 So.2d 176, this Court held that the maximum sentence of 15 years at hard labor for oral sexual battery was not excessive where the defendant was the 14-year-old victim's stepfather and where the acts were egregious. In State v. Gillord, 94-1076 (La.App. 3rd Cir.4/5/95), 653 So.2d 810, writ denied, 95-1162 (La.9/29/95), 660 So.2d 854, the court held that the defendant's 25-year sentence, with the first ten years to be served without benefit of probation, parole, or suspension of sentence, was not excessive for a defendant who pled guilty to forcible rape where the victim was defendant's live-in girlfriend's 14-year-old daughter, the defendant used his status to facilitate the commission of offense, the defendant threatened the victim with a gun and made threats to kill the victim's family members.
And in State v. Jackson, 597 So.2d 1188 (La.App. 5th Cir.1992), this Court held that a sentence of 40 years' imprisonment, with 20 years to be served without benefit of parole, probation or suspension of sentence, imposed upon a defendant convicted of raping a 14-year-old victim, was not excessive, although the defendant was a first felony offender.
The question presented when reviewing a defendant's sentence is not "whether another sentence would have been more appropriate but whether the trial court abused its broad sentencing discretion." State v. Jones, 99-2207 (La.1/29/01), 778 So.2d 1131, 1133. Under the present circumstances, we do not find that the trial judge abused his discretion. While he imposed the maximum sentence for oral sexual battery, the forcible rape sentence was in the mid-range, only restricted benefits for the minimum term of two years and the sentences were ordered to run concurrently. We find no merit in this assignment of error.

ERROR PATENT DISCUSSION
The Defendant requested an error patent review. This Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5th Cir. 1990) regardless of whether defendant *315 makes such a request. The following errors requiring correction were found.
There is a discrepancy between the commitment and the transcript because the transcript reflects that the trial judge indicated that the first two years of the forcible rape sentence was to be served without benefit of probation, parole and suspension of sentence, while the commitment does not. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, we find it necessary to remand the matter to the trial court to allow the trial judge to correct the commitment so that it corresponds with the transcript.
It is also noted that, in error, the commitment states that the trial judge properly notified the Defendant of the prescriptive period for filing post-conviction relief, whereas the transcript does not. Since the transcript prevails, we find that the record does not evidence that the Defendant was properly notified, under La. C.Cr.P. art. 930.8, of this prescriptive period. Accordingly, on remand, the trial court is ordered to provide the Defendant with a complete written advisement of the post-conviction prescriptive period as set out in La.C.Cr.P. art. 930.8 and to have placed in the record written proof of the Defendant's receipt of the information. See, State v. George, 99-887 (La.App. 5th Cir.1/4/00), 751 So.2d 973, 975.
It is also noted that the record does not reflect that the Defendant was notified of the sex offender registration requirements. The Defendant's convictions of forcible rape and oral sexual battery are defined as sex offenses by La. R.S. 15:541(14.1). La. R.S. 15:542 outlines mandatory registration requirements for sex offenders. In addition, La. R.S. 15:543(A) requires the court to notify a defendant charged with a sex offense in writing of the registration requirements of La. R.S. 15:542, as follows:
§ 543. Offender notification
A. The court shall provide written notification to any defendant charged with a sex offense of the registration requirements of R.S. 15:542. Such notice shall be included on any guilty plea forms and judgment and sentence forms provided to the defendant.
This Court has held that this omission warrants a remand for written notification. Accordingly, on remand we order the trial court to inform the Defendant of the registration requirements as provided in La. R.S. 15:543(A), by sending appropriate written notice to the Defendant, within ten days of this Court's opinion, and filing written proof in the record of the Defendant's receipt of the information. See, State v. Stevenson, 00-1296 (La. App. 5th Cir.1/30/01), 778 So.2d 1165, 1166-1167.
La. R.S. 15:542.1, entitled "Registration of sexually violent predators and child predators," provides that "[a]ny person convicted of a sex offense as defined in R.S. 15:541(14.1) or of a criminal offense against a victim who is a minor as defined in R.S. 15:541(9) after July 1, 1997, shall have the duty to register and report under the provisions of this Chapter." Further, La. R.S. 15:542.1(C) provides for the notification of the registration requirements as follows:
C. Notice to the offender. If a person who is required to register under this Section is released from prison, or placed under parole, supervised release, or probation, a Department of Public Safety and Corrections officer, or the court if the offender is not placed in the jurisdictional custody of the Department of Public Safety and Corrections, shall:

*316 (1) Inform the person of the duty to register and report, and obtain the information required for such registration. (Emphasis added.)
Thus, while 15:543(A) requires the court to notify a defendant charged with a sex offense of the registration requirements of R.S. 15:542, the predator registration statute, 15:542.1(C), requires additional notification.
In State v. Thompkins, 04-1062 (La. App. 5th Cir.2/15/05), 896 So.2d 1165, the Court recognized that, until recently, our published decisions had remanded for the trial court to provide notice of the general sex offender registration requirements contained in La. R.S. 15:542, as required by La. R.S. 15:543(A), even when the victim was a minor where the defendant was sentenced to hard labor.[8] The Thompkins court further noted that these decisions are silent as to the trial court's duty to notify a defendant who is convicted of a qualifying offense under La. R.S. 15:542.1 of his registration requirements as a child predator. Thompkins, 896 So.2d at 1170-1172.
The Thompkins court observed that the recent decisions of State v. Carter, 04-482 (La.App. 5th Cir.10/26/04), 888 So.2d 928 and State v. Myles, 04-434 (La.App. 5th Cir.10/12/04), 887 So.2d 118 had required the trial court to notify the defendants of the registration requirements of the predator registration statute, La. R.S. 15:542.1. The Thompkins court concluded that for defendants convicted of offenses referred to in La. R.S. 15:542.1, it appeared Carter and Myles had expanded the trial court's duty to provide notification of the registration requirements of La. R.S. 15:542.1. As such, the Thompkins court remanded the matter for the trial judge to provide written notice of the general sex offender registration provisions of La. R.S. 15:543 and the provisions of La. R.S. 15:542.1. Id. at 1172. Accord, State v. Turner, 05-75 (La.App. 5th Cir.5/31/05), 904 So.2d 816, 825.
Accordingly, on remand we further order the trial court to provide written notice of the child predator registration provisions of La. R.S. 15:542.1, with written proof of receipt by the Defendant filed in the record.
For the reasons stated above, the Defendant's convictions for forcible rape and oral sexual battery and respective sentences of imprisonment at hard labor of 25 years, two to be served without benefit of parole, probation or suspension of sentence, and of 10 years to be served without benefit of parole probation or suspension of sentence, to be served concurrently, are affirmed. The case is remanded for the trial court to provide proof in the record of the Defendant's receipt of appropriate notice under La.C.Cr.P. art. 930.8, La. R.S. 15:542.1 and La. R.S. 15:543.
AFFIRMED AND REMANDED.
NOTES
[1] The victim and her family are identified by initials in order to protect her identity. See La. R.S. 46:1844(W)(3).
[2] A buccal sample is taken by rubbing a Q-tip in the inside of the mouth in order to obtain fluid to test a person's DNA.
[3] It is noted that Pineda only tested the genital swab, State's Exhibit 15. This item was a piece of gauze containing samples taken from the inside and outside of the victim's vagina. Because Pineda obtained the profile from the genital swab, there was no need to test the vaginal swabs.
[4] The State filed a multiple offender bill of information alleging the Defendant to be a second felony offender, which the Defendant denied. The appellate record does not reflect that the multiple bill has been heard.
[5] It is noted that this Court granted the defendant's motion to file a pro se appellant brief and set January 3, 2006 as the due date for the brief. No brief has been filed.
[6] A.R. described the Defendant as "big" and "old" in her videotaped statement to Gordon.
[7] The penalty provision was changed in 2001 from 15 to 10 years. See, La. Acts 2001, No. 301, § 1.
[8] These cases are cited in Thompkins and are not repeated here.