GREG G. GUIDRY, Judge.
| ?,The Defendant, Anthony Graffia, appeals his convictions for: 1) aggravated robbery, a violation of La.R.S. 14:64.4; 2) attempted aggravated rape, violations of La.R.S. 14:27 and 14:42; and 3) second degree battery, a violation of La.R.S. 14:34.1. He also appeals his sentence on the attempted aggravated rape conviction. We affirm the convictions and sentences, and remand for instructions relative to sex offender registration notice.
The Defendant was charged with the above offenses on May 12, 2004.[1] Following his pleas of not guilty, he filed an omnibus motion, including a Motion to Suppress Confession, Identification, and Physical Evidence. On November 4, 2004, the trial judge denied the motions to suppress identification and statements. On May 16, 2006, a twelve-person jury found the Defendant guilty as charged. On |sMay 25, 2006, the trial judge sentenced the Defendant to 40 years for the aggravated robbery conviction; to 50 years without benefit of probation, parole, or suspension of sentence for the attempted aggravated rape conviction; and three to five years for the conviction of second degree battery. *1188 All the sentences were ordered to be served at hard labor, and to run concurrent with one another.
According to the victim, J.H.[2], on March 2, 2004, J.H. was working the night shift at the Captain’s Den, a bar in Jefferson Parish. Before closing, a man identifying himself as Tony came into the establishment. There were two regular customers in the bar, Marc Cantrelle and L.J. Tony, later identified by the victim in a lineup and in court as the Defendant, told J.H. and the other customers that he had gotten out of prison six months ago. Subsequently, both Cantrelle and L.J left the bar, but Cantrelle returned. J.H. offered Cantrelle a ride home, because the Defendant’s presence had begun to alarm her and she did not want to be alone with him in the bar. The Defendant asked J.H. for a ride, but she refused, telling him she did not know him. When J.H. prepared to close the bar, she told everyone to leave. As soon as the Defendant left, she locked the door after him. She and Cantrelle remained inside while she completed her duties.
The Defendant returned ten minutes later, and asked to use the bathroom, but J.H. refused to let him in the bar. Later, J.H checked outside to see if he was still there, but did not see the Defendant. However, when she and Cantrelle went outside after locking up, the Defendant was standing by her van. When she unlocked her van doors, the Defendant got inside and sat in the back seat without her permission. Nervous about the situation, J.H. asked Cantrelle to sit in the front passenger seat. J.H. testified that she felt threatened enough to place a knife she |4kept in the pocket of her car door under her leg.[3] Following the Defendant’s directions, she drove until he told her to stop. When Cantrelle got out and opened the van door to let the Defendant exit, the Defendant began hitting him and punching J.H. in the face. The Defendant pushed Cantrelle out of the van, grabbed J.H. and dragged her between the seats. While J.H. was flat on her back on the floorboard, he punched her in the face. He then got into the driver’s seat and drove away with J.H, telling her to get into the front seat. J.H. got into the front seat as instructed.
J.H. testified she first thought the Defendant wanted to rob her of money from the bar, but the Defendant then told her to take off her clothes. At that point, she believed he was going to rape her, so she began kicking him in the face. The Defendant responded by beating her and screaming, “I’m going to fucking kill you, bitch.” (R., p. 359). J.H. was convinced the Defendant was going to kill her as he continued to beat her, saturating her clothes in blood. She had so much blood in her face and her eyes that she could not see. He also bit her. When he stopped biting her little finger, J.H. was able to reach the keys and turn off the van engine. As the Defendant tried to re-start the van, she escaped. The Defendant drove off. The van contained her purse, credit card, cell phone, all her college course books, and supplies and equipment for her cleaning business.
*1189 J.H. was subsequently taken to Ochsner Hospital where she received treatment for her injuries. She suffered fractures to her nose, cheekbones, and eye socket, a torn rotator cuff, a dislocated rib from the breastbone, three bulging discs in her neck and two bulging discs in her mid-back. J.H. required five stitches on her face and five across her eye. J.H.’s teeth were loose, and she suffered nerve damage that caused her to have no feeling in her upper lip and her front teeth.
| RJ.H. checked her bankcard on-line and found that the Defendant used it to buy gas in Picayune, Mississippi. Her van was later recovered with everything inside missing, including a secondary radio. The van was covered in blood from her injuries. J.H. identified the Defendant in a physical lineup. She was unable to make identification in an initial photographic lineup.
Cantrelle’s testimony was similar. He testified that prior to closing the bar, only he, J.H., and another man were there. When J.H. locked the bar, Cantrelle was the only person inside with her. When they left to go to J.H.’s vehicle, the man who had been in the bar came to the van. All three of them left in J.H.’s van, with Cantrelle riding in the front passenger seat. He stated that the other man attacked him after Cantrelle opened the door of the van to let him out. He was beaten until he fell or was shoved out of the van.
Detective Carroll searched J.H.’s van after it was recovered, and found bloodstains on the steering wheel, console, seats and carpet. DNA testing revealed that all of the blood samples taken from the van belonged to J.H.
The Defendant testified that he had pri- or convictions in 1984 for accessory after the fact to first degree murder, and in 2000 or 2001 for simple criminal damage and attempted possession of heroin. According to him, after arriving at the Captain’s Den on the night in question, he purchased a beer and engaged in a conversation with J.H. and Cantrelle. Later, Cantrelle went to his car and “fumbled” in it for a few minutes, before he returned to the bar. When J.H. offered Cantrelle a ride home, the Defendant asked J.H. for a ride, because he had just gotten out of jail and was on parole. According to the Defendant, J.H. agreed to give him a ride home, but told him that he would have to leave the bar and wait outside. After the Defendant saw several police cars outside, he asked to re-enter the bar to get out of the view of the officers. J.H. refused to let the Defendant back [fiin, because she did not know him and was counting money. The Defendant asked her to hurry, and smoked some marijuana while waiting. When J.H. and Cantrelle came out, they all got into the van. J.H. was in the driver’s seat, Cantrelle in the passenger seat, and the Defendant in the back seat. The Defendant claimed that when he knelt between the two seats, Cantrelle hit him on the back of his head. He thought that Cantrelle was trying to rob him, because J.H. knew he had money. He also thought that Cantrelle might have gotten a gun earlier from his car. The Defendant claimed he and Cantrelle started to fight, and then J.H. tried to grab the Defendant and started kicking him. During the melee, the van struck a parked vehicle or something, and came to a stop. According to the Defendant, both Cantrelle and J.H. continued to fight him. As he fought with J.H., Cantrelle opened the door of the van and jumped out. J.H. also exited the van in the same place as Cantrelle. The Defendant admitted that some of J.H.’s inju- *1190 ríes could have been caused by the altercation.
The Defendant said that he drove off in J.H.’s van without her permission, because he was nervous and he did not want to get out to fight them. The Defendant was also scared that he could go to jail for three years, because he had violated his probation by being in a barroom, and there was an outstanding warrant for his arrest. The Defendant testified that he had not reported to his parole officer, and that she was looking for him. The Defendant admitted that he drove to Picayune, Mississippi that morning, and used J.H.’s credit card to get gas. He later returned to the New Orleans area, leaving J.H.’s van in New Orleans East.
On appeal, the Defendant asserts that the trial judge erred in denying his Motion to Suppress the Identification in view of the explicit denial of appellant’s right to counsel. He also asserts that his sentence of fifty years is excessive. The Defendant further requests an error patent review.
17In his first assignment of error, the Defendant argues that he was denied his right to counsel at the physical lineup after he made a specific request to have counsel present, which was a fundamental denial of due process. He claims that his request was timely and unequivocal, and at a critical stage in the prosecution, i.e. following his arrest after a tentative identification. He also claims that the physical identification was crucial to the State’s case, because there was a lack of forensic evidence linking him to the crime.
At the hearing on the motions to suppress, Detective John Carroll testified that J.H. was only able to make a tentative identification from the photographic lineup. After obtaining an order for a physical lineup, Detective Carroll contacted the Defendant to participate. The Defendant asked Detective Carroll to prepare a document regarding his attendance at the lineup. On March 25, 2004, Detective Carroll wrote a note, stating, “... [the Defendant] has requested the presence of an attorney. I have been informed by him that he has not acquired an attorney nor has he been assigned an attorney by IDB.” (State’s exhibit, S-7). Detective Carroll informed the Defendant that if he could not acquire an attorney, he would try to find one for him from the Indigent Defender Board (IDB). On the same day, Detective Carroll personally went to IDB to inform them of the Defendant’s request. When he asked if anyone was available, he was informed by the clerk or receptionist that no one was available, and that “they wouldn’t go anyway.” (R., p. 125). Detective Carroll left the court order with IDB, pursuant to procedure. The physical lineup was then conducted the same day. At the lineup, as part of standard procedure, the Defendant was allowed to pick the participants for the lineup and select their placement. The Defendant chose to place himself in the fourth position. J.H. positively identified the Defendant at that time. Subsequently, the Defendant voluntarily agreed to talk to Detective Carroll. | ^Detective Carroll questioned the Defendant after he was reminded that he was advised of his rights, and the Defendant indicated that he understood them.
At the motion hearing, J.H testified that she identified either number two or number four in the photographic lineup, as the man who attacked her. However, she positively identified the Defendant in the physical lineup, even though one of the other participants in the lineup drew attention to himself by stomping his feet. She was not forced, coerced, intimidated, or *1191 promised anything to make the identification.
After the presentation of the evidence and the testimony of the witness, the trial judge denied the motion to suppress the identification finding no constitutional violations. The trial judge noted that Detective Carroll personally went to IDB and showed them the court order in order to obtain counsel for the Defendant. Detective Carroll was informed that no attorney would be provided to the Defendant. The court found that “the Sheriffs Office did everything it could to make sure that [the defendant] had counsel.” (R., p. 150).
In State v. Carter, 98-24, p. 4 (La.App. 5th Cir.5/27/98), 712 So.2d 701, 704, writ denied, 98-1767 (La.11/6/98), 727 So.2d 444, this Court analyzed the jurisprudence in regard to the right to counsel at a physical lineup. There we found that the defendant’s Sixth Amendment right to counsel was not violated when the physical lineup was conducted without counsel present. At the time of the lineup, the adversary judicial criminal proceedings had not commenced such that the right to an attorney embodied by the U.S. Const. Amend. 6 and La. Const. Art. 1, § 13 attached, i.e. there had been no formal charge, preliminary hearing, indictment, information, or arraignment. In reaching our conclusion, we considered the evidence showing that the defendant did not ask for counsel to be present at the lineup, a police officer personally delivered a copy of the motion to compel lineup |9to the IDB, although no one from IDB attended, the police did not engage in a bad faith effort to circumvent the defendant’s right to counsel, and there was no evidence that counsel’s presence would have changed the outcome of the lineup. In addition, we found that the lineup procedures were not suggestive or tainted in any way. Rather, the testimony and evidence established that the lineup was conducted according to fair and standard police procedure. We reached a similar result in State v. Duplessis, 00-971, p. 3 (La.App. 5th Cir.12/13/00), 777 So.2d 529, 531.
In the present case, the Defendant was under arrest when the lineup was conducted,[4] but no formal charge, preliminary hearing, indictment, bill of information, or arraignment had been held, filed, and/or returned. Thus, the adversary judicial criminal proceedings against the Defendant that would have secured his right to an attorney under the Sixth Amendment had not commenced when the lineup was conducted. Nevertheless, the State accommodated the societal interest in fair and accurate fact-finding, and the Defendant’s statutory right to counsel following his arrest, by trying to comply with the Defendant’s request for counsel prior to the physical lineup. Furthermore, the Defendant was allowed to pick the participants for the lineup and select their placement. Thus, the State did not engage in a bad faith effort to circumvent Defendant’s right to counsel, nor is there any evidence that counsel’s presence would have changed the outcome of the lineup. Rather, the testimony and evidence established that the lineup was conducted according to fair and standard police procedure, and was not tainted or suggestive in any way. Under these facts, we find no constitutional violations by the State in conducting the lineup without the presence of counsel. |1f)Thus, the trial judge did not err in denying the motion to suppress the identification.
The Defendant next asserts that his sentence of fifty years without parole is exces *1192 sive. The Defendant contends that the sentence amounts to a life sentence, because he is only forty years old. In addition, the Defendant suggests that the trial court failed to consider the sentencing criteria set forth in La.C.Cr.P. art 894.1.
The Defendant did not make or file a motion to reconsider the sentences or object to the sentences. This Court has recognized that the failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a review of his sentence for constitutional excessiveness only. State v. Polizzi 05-478, p. 15(La.App. 5th Cir.2/14/06), 924 So.2d 303, 313, writ den. 06-1052 (La.11/3/06), 940 So.2d 660. Accordingly, the sentence will be reviewed for constitutional excessiveness.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La.1992). Even though a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4.
The trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports Inthe sentence imposed, even when the trial judge does not provide reasons for the sentence. Polizzi, 05-478 at 16, 924 So.2d at 313.
The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Polizzi 05-478 at 17, 924 So.2d 314.
The Defendant challenges only his 50 year sentence for the attempted aggravated rape conviction. Pursuant to La. R.S. 14:42 and R.S. 14:27 D(1)(a), the sentencing range for this crime is imprisonment at hard labor for not less than ten, nor more than fifty years, without benefit of parole, probation, or suspension of sentence. Id.; State v. McLelland, 03-498, p. 10 (La.App. 5th Cir.10/15/03), 860 So.2d 31, 37, writ den., 03-3372 (La.3/26/04), 871 So.2d 347.
The victim in this case was brutally beaten. She sustained extremely severe injuries before and during the life threatening fight with the Defendant. She believed that he intended to both rape and kill her. The Defendant, who was 37 years old at the time, had been released from prison shortly before this incident. He was wanted on an outstanding warrant, and was violating his probation at the time by being in the bar, and by avoiding contact with his parole officer. He had a serious criminal history. Although the trial judge did not fist his reasons for the sentence, before sentencing the Defendant, the trial judge stated he listened to the testimony, viewed the evidence and photographs and concluded that “this was pretty heinous.... ” The judge further stated that he believed that the Defendant lied during his testimony. The judge was aware of the Defendant’s criminal history. *1193 The judge’s comments indicate he considered those factors in sentencing the Defendant. Furthermore, he could have concluded from the facts that the Defendant was not rehabilitated by his prior imprisonment, and is an egregious offender deserving of the maximum sentence. After our review, we find the trial l1Pjudge did not abuse his discretion in sentencing the Defendant to 50 years imprisonment without benefit of parole, probation, or suspension of sentence, and further find that the sentence is not excessive.
ERROR PATENT
The record was reviewed for patent errors in accordance with La.C.Cr.P. art. 920, State v. Oliveaux, 312 So.2d 337, 338 (La.1975), and State v. Polizzi 05-478 (La.App. 5th Cir.2/14/06), 924 So.2d 303, 313, writ den. 06-1052 (La.11/3/06), 940 So.2d 660. We find one patent error.
La.R.S. 15:542(E). La.R.S. 15:540, et seq., requires registration of sex offenders and La.R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirement of La.R.S. 15:542. The trial judge here failed to provide Defendant with the required written notice. Consequently, we will instruct the trial judge to send written notice to Defendant of the registration requirement within 10 days of this opinion, and to file a copy of same in the record, in accordance with State v. Stevenson, 00-1296 (La.App. 5th Cir.1/30/01), 778 So.2d 1165, State v. Berniard, 03-484 (La.App. 5th Cir.10/15/03) 860 So.2d 66, and State v. Patterson, 05-560 (La.App. 5th Cir.1/31/06) 922 So.2d 1195.
Accordingly, the Defendant’s convictions and sentences are hereby affirmed. Further, the trial judge is ordered to provide written notice to the Defendant of the registration requirements of La. R.S. 15:542.1 and R.S. 15:543 A within ten days after rendition of this opinion, and to file written proof in the record that the Defendant received such notice.

AFFIRMED AND REMANDED.

. The Defendant was also charged with aggravated rape, a violation of La.R.S. 14:27 and 14:42, and sexual battery, a violation of La.R.S. 14:43.1. Those charges were nolle prossed by the State following the trial on the first three charges.

. In accordance with La.R.S. 46:1844(W)(3), we refer to the victim of this sex offense by her initials to protect her identity. State v. Berniard, 03-484, p. 11 (La.App. 5th Cir.10/15/03), 860 So.2d 66, 78, writ denied, 03-3210 (La. 3/26/04), 871 So.2d 345.

. Detective John Carroll of the Jefferson Parish Sheriff’s office testified that he did not remember J.H. mentioning a knife in her statement.

. The Defendant was arrested on March 16, 2004. The lineup was on March 25, 2004.