829 So.2d 650 (2002)
STATE of Louisiana
v.
David Wayne SIMPSON, a/k/a Wayne David Simpson.
No. 2001-KA-1850.
Court of Appeal of Louisiana, Fourth Circuit.
October 16, 2002.
Rehearing Denied November 20, 2002.
*652 Richard P. Ieyoub, Attorney General, Darryl W. Bubrig, Sr., District Attorney, Belle Chasse, LA, and Gilbert V. Andry IV, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Karen G. Arena, Louisiana Appellate Project, River Ridge, LA, for Defendant/Appellant.
(Court composed of Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY).
PATRICIA RIVET MURRAY, Judge.
The principal issue presented in this case is whether the affirmative defense of entrapment applies. Finding it does not, we affirm.

STATEMENT OF THE CASE
On December 11, 1997, David Wayne Simpson (also known as Wayne David Simpson) was arrested for selling crack cocaine to a trio of undercover agents. The trio consisted of Sergeant Allen Wall, a veteran officer, and two new agents, Kelly Gonzales and Lawrence Arceneaux. The sale occurred at about 10:38 p.m. on August 1, 1997, on the River Road behind Roosevelt Pansy Lane in Bootheville, Louisiana. Mr. Simpson sold the officers three off-white rock-like objects (that tested positive for cocaine) for forty dollars in sheriff's office funds. On December 11, 1997, Mr. Simpson was arrested and charged with distribution of cocaine.
On February 19, 1998, Mr. Simpson was charged by a bill of information with one count of distribution of cocaine in violation *653 of La. R.S. 40:967.[1] That same day, Mr. Simpson was arraigned and pled not guilty. On April 14, 1998, the trial court denied Mr. Simpson's various motions to suppress and found probable cause.
At the start of trial, the parties stipulated that the objects tested positive for cocaine. During his trial, Mr. Simpson admitted to selling the cocaine to the trio of officers on the date in question, yet asserted the affirmative defense of entrapment. The jury convicted him of the lesser offense of simple possession of cocaine. The trial court sentenced Mr. Simpson to five years at hard labor. This appeal followed.

STATEMENT OF FACTS
At trial, Sgt. Wall testified that on the night of August 1, 1997, he was working in the Plaquemine Parish area conducting an undercover narcotics investigation; he testified he had been working in that area for about six months. That night he was accompanied by Agents Gonzales and Arceneaux. Dressed in street clothes and driving a rental vehicle, the trio went to the Fleur-d-Lis bar to look for a familiar face. Upon entering the bar, Sgt. Wall testified that he spotted Mr. Simpson as someone he had seen in the Buras area. Sgt. Wall then engaged in a short conversation with Mr. Simpson. Detailing that initial conversation, Sgt. Wall in his testimony gave the following narrative:
[We] started talking and complained about the temperature of the beer, the beer was not cold. From that he conversed to the beer was weak and maybe we could have something better for the night. From that he asked what would I be looking for? Was I looking for something in particular? And I said what can you offer? In response to that I asked if he had rocks available. And he says how many, how much? And I referred to three rocks, hundred dollars worth, whatever, I wasn't particular. And, actually he looked not sure at first, he looked around to see and then he says I can get them. I said okay. Just like that, okay. And he looked around again and at the same time Agent Gonzales came out the bathroom, the female agent. When she came out of bathroom he turned around and looked. I said these are my friends, they are with me. He said I have to make a ... phone call and I said okay ... expecting him to use the phone in the car. He said we need to go somewhere to make the call. I said okay, I have my car if you want to ride with me. From that point he looked to me and I nodded for them to come out. We walked out and got in the vehicle.
Sgt. Wall testified that he sat in the driver's seat, Agent Gonzales sat next to him in the front, and Agent Arceneaux and Mr. Simpson sat in the rear seat. Mr. Simpson then directed that they stop at a convenience store so that he could use the pay phone. Mr.Simpson exited the car, made a very short phone call, and then reentered the vehicle. Mr. Simpson then stated: "we can get it, they have it, but we have to ride."
Following Mr. Simpson's instructions, they rode down to the Venice area, which was about a fifteen-minute trip. When they came to a lane off of River Road going back to an area with some trailers, Mr. Simpson instructed them to drop him off, to circle around the block, and to come back to get him. At this point, Agent Arceneaux gave Mr. Simpson some money to make the buy. After Mr. Simpson exited *654 the vehicle, they made a U-turn, circled back, and saw Mr. Simpson walking back to River Road. Mr. Simpson reentered the vehicle and handed Agent Gonzales three rocks that were apparently crack cocaine. Sgt. Wall testified that Mr. Simpson then requested to be brought home. After complying with that request and dropping him off on the side of the road near his home in Venice, the trio met with Deputy Morris Roberts of the Plaquemines Parish Sheriff's Office.
Deputy Roberts testified that he provided the back-up surveillance that night for the trio. He corroborated Sgt. Wall's testimony as to the path they took that night. Particularly, he detailed the interactions between the trio and Mr. Simpson from their meeting in the Fleur-d-Lis bar through their driving Mr. Simpson home. He testified their first stop was at a Circle K; at that location, he observed Mr. Simpson exit the rental vehicle, make a short (about twenty seconds) phone call from the pay phone, and reenter the vehicle. Their next stop was near River Road in Bootheville and Roosevelt Pansy Lane. At that location, Mr. Simpson exited the rental vehicle, and the vehicle departed. Deputy Roberts then observed Mr. Simpson walk across Pansy Lane and meet with Colbert Franklin, a known drug trafficker. He then witnessed a hand-to-hand exchangeMr. Simpson handed Mr. Franklin money in exchange for cocaine. The rental vehicle then reappeared, and Mr. Simpson got back in the vehicle. Their final stop was at Mr. Simpson's residence. After dropping Mr. Simpson off, the trio went to a prearranged location, where they met with Deputy Roberts and turned the cocaine over to him.
Agent Arceneaux testified that he assisted Sgt. Wall in the undercover buy from Mr. Simpson. According to Agent Arceneaux, Sgt. Wall was the only one who made contact in the bar with Mr. Simpson; neither he nor Agent Gonzales engaged in any conversations with Mr. Simpson in the bar. Corroborating Sgt. Wall's testimony, he testified that when the initial conversation between Sgt. Wall and Mr. Simpson took place Agent Gonzales was in the restroom and he was playing pool. After a few minutes, Sgt. Wall made eye contact with him, which he recognized as a signal that Sgt. Wall had made a contact. He stated that Sgt. Wall introduced him to Mr. Simpson before they left the bar. As to his role in the deal, he stated that he handed Mr. Simpson forty dollars of task force money for the narcotics buy.
Agent Gonzales testified that she also assisted Sgt. Wall in the undercover buy from Mr. Simpson. Her testimony regarding the events of that night corroborated that of Sgt. Wall and Agent Arceneaux.[2] She stated that when Sgt. Wall was conversing with Mr. Simpson in the bar, she was in the restroom. By the time she exited the restroom, they had gone outside. When she went out to the parking lot, Sgt. Wall introduced her to Mr. Simpson. He introduced himself to her as Wayne. She described the attire he was wearing as a red T-shirt, blue jeans, and rubber shrimp boots. As to her role in the deal, she testified that Mr. Simpson handed the three rocks of cocaine to her. She denied having any conversation with Mr. Simpson, much less making any insinuation *655 that she would spend the night with him in return for this drug deal. She testified that, of the trio, she had the least contact with Mr. Simpson. She summarized her contacts with him that night as limited to being introduced to him outside the bar, sitting ahead of him in the rental car, and receiving the cocaine from him.
Mr. Simpson took the stand in his own defense. He acknowledged his prior convictions for possession of marijuana about thirty years ago and for four counts of simple burglary and eleven counts of illegal possession of stolen things in 1993. In October 1997 when the alleged offense occurred, he testified that he had just moved back to Plaquemines Parish. He explained that his family was in the fishing business and that over the years he relocated back and forth between Concordia and Plaquemines Parish depending on the fishing business. He stated that he had just started working at a new welding job.
On the night of August 1, 1997, he walked from his home to the Fleur-d-Lis Bar at approximately 8:30 p.m. to have a couple of beers. At that time, only a handful of patrons were in the bar. He stated that he talked to the barmaid, drank a few beers, and played a few games of pool. About an hour later, he noticed the undercover agent trio enter the bar. Contrary to the trio's testimony, Mr. Simpson denied having any conversation with Sgt. Wall. Rather, he testified that his only conversation was with Agent Gonzales, who told him that Sgt. Wall and Agent Arceneaux were her friends.
According to Mr. Simpson, it was Agent Gonzales who approached him and started a conversation with him. Describing her appearance, he stated that she was dressed in a leather trench coat and looked like an "old hippy." He testified that she asked if he knew where they could get a couple of rocks. He replied that he did not do drugs and that he did not know where to get them. Agent Gonzales walked off, but returned a few moments later repeating the same request. He stated that "she made one more round, she came up real jolly and she said look, I just want to get high she says, and have a good time." From that, he testified that he believed that she was going to be his girlfriend for the night if he obtained drugs for her.
Mr. Simpson stated that after being asked three times by Agent Gonzales he told her that he could make a phone call to a co-worker, whom he referred to as "Billy" (he denied knowing Billy's last name), and possibly get a couple of rocks. He admitted getting into the vehicle with the trio, taking forty dollars from one of them, walking down the lane, meeting with a man, buying three rocks, and handing the rocks to Agent Gonzales. He denied that either the person he called from the pay phone or the person who sold him the rocks was Mr. Franklin. He testified that he did not keep any of the cocaine or money. He stated that he then asked Sgt. Wall to drive him home because he thought Agent Gonzales would accompany him to his residence. When they arrived, however, he stated that the trio blew him off and departed. Four months later, he was arrested and charged with distribution of cocaine.

ERRORS PATENT
A review for error patent on the face of the record reveals none.

DISCUSSION
All three of Mr. Simpson's assignments of error entail an evaluation of the defense of entrapment. First, he argues that the state failed to overcome his entrapment defense. Second, he argues the trial court failed to properly instruct the jury on entrapment. *656 Finally, he argues the record is deficient in that the jury instructions were not transcribed. We address these arguments in order.

ENTRAPMENT DEFENSE
Mr. Simpson's first assignment of error is that the state failed to overcome his entrapment defense. Outlining the entrapment defense, we recently stated in State v. Harry, 2001-2336, p. 5 (La.4 Cir.6/26/02), 823 So.2d 987, 992:
"Entrapment" is an affirmative defense that applies when a law enforcement official originates the idea of the crime and induces another person to engage in conduct constituting the crime, when the other person is not otherwise disposed to do so. The defendant claiming entrapment must prove the defense by a preponderance of the evidence. To adequately support an entrapment defense, the defendant must present exculpatory circumstances that defeat culpability even though the state proved all essential elements of the crime beyond a reasonable doubt. The reviewing court must consider the defendant's predisposition to commit the crime as well as the conduct of the police officers. (Citations omitted).
The elements of entrapment are two-fold: (1) an inducement by a state agent to commit an offense; and (2) lack of a predisposition to commit the offense on the part of the defendant. State v. Alford, 99-0299 (La.App. 4 Cir. 6/14/00), 765 So.2d 1120, writ denied, 2000-2120 (La.9/28/01), 797 So.2d 683. The burden is on the defendant to prove the first element (inducement) by a preponderance of the evidence; the burden is on the state to prove the second element (predisposition) beyond a reasonable doubt. See State v. Kerrigan, 27,846, p. 4 (La.App. 2 Cir. 4/3/96), 671 So.2d 1242, 1245.
In entrapment cases, courts are called upon to draw a line "between the trap for the unwary innocent and the trap for the unwary criminal." State v. Brand, 520 So.2d 114, 117 (La.1988). "An entrapment defense will not lie if the officers or agents merely furnished a defendant who is predisposed to commit the crime the opportunity to do so." State v. Moody, 393 So.2d 1212 (La.1981); State v. Prudhomme, 532 So.2d 234, 240 (La.App. 3 Cir.1988).
Contentions of entrapment are reviewed on appeal pursuant to the sufficiency of evidence standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See State v. Long, 97-2434 (La.App. 4 Cir. 8/25/99), 744 So.2d 143, 150-51, writ denied, 1999-2780 (La.3/17/00), 756 So.2d 1140, cert. denied, 531 U.S. 835, 121 S.Ct. 93, 148 L.Ed.2d 53 (2000). The relevant inquiry is "whether any rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could conclude that the defendant did not prove that he was entrapped by a preponderance of the evidence." State v. St. Amant, 584 So.2d 724, 726 (La.App. 4 Cir.1991). If we conclude that Mr. Simpson carried his burden of proving that the agents induced him to commit the crime, then the next inquiry is whether the state adduced evidence of his predisposition to commit the crime.
As a noted scholar had commented, this is a sort of "reverse Jackson " standard in that it focuses on whether the jury's failure to find inducement is unreasonable in view of the evidence. Cheney C. Joseph, Appellate ReviewSufficiency of Evidence to Establish Affirmative Defense, 49 La. L.Rev. 329, 345 (1988). Applying that standard to the facts of this case, we conclude that a reasonable jury could have found that the defense of entrapment *657 was not established. Mr. Simpson's sole evidence in support of his contention that he was induced into committing the crime was his own testimony that the agents approached him and that Agent Gonzales had to plead with him on three separate occasions before he agreed to do it. As noted, he testified that he gave in only because she insinuated that they might get to spend more time together later that night. Simply stated, his argument is that she was the protagonist, that he was a puppet, and that this is a classic case of entrapment.
Considering the officers' testimony, it would not have been unreasonable for the jury to conclude that Mr. Simpson was not entrapped, thus, eliminating the need to consider the second prong of the entrapment defensepredisposition. Nonetheless, even assuming as Mr. Simpson contends that there was some inducement, the evidence clearly shows he was predisposed to commit the crime. Contrary to his contention, the mere fact that he was not the target of a narcotics investigation and had no recent narcotics convictions does not mean he was not predisposed. Rather, the relevant inquiry for determining predisposition focuses on the defendant's readiness to commit the crime.
Some definite criteria that have been identified as helpful in determining the predisposition issue are the defendant's: (a) initial suggestion of the crime, (b) readiness to commit it, (c) familiarity with the criminal activity, (d) possession of illegal contraband prior to the alleged entrapment, (e) ready access to contraband, (f) ability to collect a large quantity of contraband in a short time, and (g) in-court testimony and admissible out-of-court statements. 21 Am.Jur.2d Criminal Law § 205 (1981).
Applying these criteria to the instant case, Sgt. Wall testified that Mr. Simpson was the one that first broached the subject of a drug deal and that he merely referred to getting "something better" than the warm beer the bar was serving. Exhibiting a readiness to commit the crime, Mr. Simpson told the trio that he could secure the cocaine by making a phone call. Moreover, Mr. Simpson did not simply give the trio directions to a location where cocaine could be purchased; rather, he accompanied them in their rental car and instructed them to the area to make a buy. Once there, he instructed them to leave while he made the buy. Mr. Simpson then took their money and purchased the cocaine for them. He then delivered the cocaine to them. Mr. Simpson's actions evidenced his readiness to commit the crime.
Although Mr. Simpson denied, several times during his testimony, any familiarity with such criminal activity, the jury obviously did not believe him. The jury's determination that Mr. Simpson's denials were not credible is supported by the testimony of Agent Arceneaux, who testified, based on his undercover experience, that Mr. Simpson obviously had engaged in such transactions before or he would not have been able to make a short phone call and swiftly get the drugs. Additional support is found in the testimony of Deputy Roberts, which corroborated the undercover trio's testimony regarding the events of the night. Finally, from Mr. Simpson's own actions (summarized above) in taking the lead it can be inferred that he knew where cocaine could be purchased and was predisposed to commit the crime of distribution of cocaine. See State v. Kanost, 99-1822 (La.App. 4 Cir. 3/29/00), 759 So.2d 184, 187, writ denied, XXXX-XXXX (La.11/13/00), 773 So.2d 726.
Mr. Simpson's contention that the state failed to overcome his defense of entrapment is not persuasive.

*658 JURY INSTRUCTIONS

Mr. Simpson's second assignment of error is that the trial court erred in rejecting his request that the jury be instructed on the entrapment defense that the state has the burden of proving beyond a reasonable doubt that Mr. Simpson was not entrapped. Although the actual jury instructions are unavailable (a point addressed below), the record reflects that during voir dire a dispute arose regarding charging the jury on the burden of proving entrapment. Outside the jury's presence, defense counsel acknowledged that Mr. Simpson had the burden of proving by a preponderance of the evidence that he was induced, yet argued that pursuant to Jacobson v. United States, 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the state had the burden of proving beyond a reasonable doubt that Mr. Simpson was predisposed to commit the crime. Mr. Simpson argues that Jacobson, supra, mandates that the jury be instructed that "[t]he burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped."[3] Without the proper instruction, he contends that the jury improperly concluded that he was required not only to prove that he was enticed to commit the crime, but also to negate the assertion that he was predisposed to commit the crime.
La.C.Cr.P. art. 807 provides that the state and defendant have the right to submit to the trial court special written charges for the jury before argument and the court may receive them, in its discretion, after argument has begun. The refusal to give a requested special jury charge does not warrant reversing a defendant's conviction unless it prejudices the accused's substantial rights. La. C.Cr.P. art. 921, State v. Marse, 365 So.2d 1319 (La.1978), State v. Giles, 93-0103 (La. App. 4 Cir. 6/15/94), 639 So.2d 323.
After reviewing and reading the standard entrapment charge, the trial court refused defense counsel's request and decided that the jury would be instructed as follows:
[T]he fact that an opportunity is furnished or that the defendant is aided in the commission of a crime which he was predisposed to commit or originate in *659 his own mind is no defense. There is a clear distinction between inducing a person to commit a crime and setting a trap to catch a person in carrying out criminal designs of his own conception. The primary emphasis is on whether or not the defendant had a predisposition to commit the crime. The reason for this defense is simple; officers of the law may not incite crime merely to punish the criminal. Thus if you find the defendant did not have an intent to commit the offense charged before being instigated to commit it; and the defendant was instigated to commit the offense charged by law enforcement officer, or by one acting as to the officer's agent, then you must find the defendant not guilty.
That charge clearly advises the jury of the two elements of entrapmentinducement and predispositionand adequately advises the jury that if Mr. Simpson had no predisposition to commit the crime but was enticed by the agents to do so, he could not be convicted. See 17 Cheney C. Joseph, Jr. and P. Raymond Lamonica, Louisiana Civil Law Treatise: Criminal Jury Instructions § 6.24 (1994)(setting forth verbatim entrapment instruction and noting such charge is based on language from Louisiana Supreme Court opinions and has been approved by that court in State v. Garrison, 400 So.2d 874 (La. 1981)). The instruction given by the trial court was sufficient.
We further note that the trial court refused the request of not only defense counsel, but also the state to add to its instruction a reference to the two different burdens of proof on entrapment. In so doing, the trial court expressed concern that adding a reference to the divided burden of proof between the defense and prosecution would confuse the jury. Similar concern was voiced, albeit in dicta, by the court in United States v. Braver, 450 F.2d 799, 805 (2nd Cir.1971), stating:
[W]e suggest that it would be preferable for the district courts of this circuit to use an entrapment charge that does not give to the jury two ultimate factual issues to decide on two different burdens of persuasion imposed upon two different parties. While we do not specifically define this preferable charge, we suggest that there be no reference to "burden" or "burden of proof" or "preponderance of evidence" in describing a defendant's obligation. In explaining the burden of proof on entrapment, it will be enough to tell the jury that if it finds some evidence of government initiation of the illegal conduct, the Government has to prove beyond a reasonable doubt that the defendant was ready and willing to commit the crime.
Given that charging the jury as to divided, different burdens of proof on entrapment would have entailed an explanation from the trial court, we find no error in its refusal to give the requested special charge. See La.C.Cr.P. art. 807 (providing that "[a] requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent." (Emphasis supplied)).
Regardless, we find no prejudice to Mr. Simpson. As noted in connection with the previous assignment of error, the record supports a finding that Mr. Simpson was predisposed to commit the crime; as discussed in connection with the following assignment of error, the state's witnesses testified that Mr. Simpson was not induced to commit the crime.

INCOMPLETE RECORD
Mr. Simpson's final assignment of error is that the unavailability of a transcript of the jury charges deprives him the right to *660 an appeal and therefore entitles him to a reversal of his conviction and sentence and to a new trial. As he points out, the court reporter has certified to the court that the jury instructions cannot be transcribed.
The Louisiana State Constitution provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La. Const. Art. I, § 19 (emphasis supplied). In addition, La. C.Cr.P. art. 843 requires that all of the proceedings in a felony case be recorded. However, when the missing portions of the trial record are not evidentiary, their absence does not compromise the defendant's constitutional right to a judicial review of the entirety of the evidence. State v. Thomas, 92-1428 (La.App. 4 Cir. 5/26/94), 637 So.2d 1272, 1274.
We rejected a similar argument that the absence from the record of a transcript of the jury instructions denied defendant's constitutional right to appeal in State v. Tucker, 95-0030, p. 4 (La.App. 4 Cir. 9/18/96), 682 So.2d 261, 263, reasoning that "where the missing portions of the trial record are not evidentiary, their absence does not compromise the defendant's constitutional right to a judicial review of all evidence." Continuing, we reasoned that given a full transcript of the evidentiary portion of the trial was made part of the appellate record, the absence from the record of a transcript of the jury instruction does not deny defendant full appellate review. Such is the case here.[4]
In this case, the trial transcript includes a complete, coherent transcription of the evidentiary portion of the trial. On cross-examination, the state's witnesses the undercover agent triospecifically denied inducing Mr. Simpson into committing the crime. To the contrary, the agents each testified that Mr. Simpson showed no hesitancy and knew exactly what he was doing. It follows then that Mr. Simpson cannot show that his appeal is prejudiced by the missing jury instructions. *661 Given the overwhelming evidence of Mr. Simpson's guilt, the missing portion of the trial transcript is inconsequential and does not warrant a reversal of his conviction. State v. Lyons, 597 So.2d 593, 599 (La.App. 4 Cir.1992).

DECREE
For the foregoing reasons, we affirm Mr. Simpson's conviction and sentence.
AFFIRMED
NOTES
[1] A co-defendant, Colbert Franklin, was also charged with the same offense. Before trial. Mr. Simpson's motion to sever was granted by the trial court.
[2] Although there were some minor inconsistencies in the agents testimony regarding the events at the bar, those inconsistencies did not involve facts pivotal to the issue of inducement or entrapment. These inconsistencies, as noted in Mr. Simpson's brief, involved facts such as whether Agent Gonzales played pool with Agent Arceneaux, whether Agent Gonzales was introduced to Mr. Simpson inside or outside the bar, and the exact amount of cash that Agent Arceneaux gave to Mr. Simpson.
[3] Defense counsel requested the trial court charge the jury using the following charge used in federal court:

The defendant asserts that he was a victim of entrapment.
Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law as a matter of policy forbids that person's conviction in such a case.
On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government agents provide what appears to be a favorable opportunity is not entrapment. For example, it is not entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to engage in an unlawful transaction.
If, then, you should find beyond a reasonable doubt from the evidence in this case that, before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as charged in the indictment, whenever opportunity was afforded, and that government officers or their agents did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment.
On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find the defendant not guilty.
[4] In State v. Frank, 99-0553 (La.1/14/01), 803 So.2d 1, 19-20, the Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. First, "[m]aterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal." 99-0553 at pp. 20-21, 803 So.2d at 19-20 (citing State v. Robinson, 387 So.2d 1143 (La.1980)(reversing given that testimony of a state and defense expert witness was missing); State v. Ford, 338 So.2d 107 (La.1976)(finding omissions material given that substantial portions of the record were missing, including the testimony of four State witnesses, voir dire examination of prospective jurors, and the prosecutor's opening statements); see also State v. Bright, XXXX-XXXX (La.App. 4 Cir. 2/6/02), 809 So.2d 1112, 1117 (finding record inadequate given "[t]he cumulative effect of the missing portions of testimony of the defendant and other material witnesses, and the frequency of `inaudible' and `spelled phonetically' in the transcript"); State v. Diggs, 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104 (citing Ford, supra, and finding the unavailability of an officer's complete testimony necessitated a new trial because it could not be determined whether the missing testimony was substantial or inconsequential). Second, "inconsequential omissions or slight inaccuracies do not require reversal." Frank, supra (citing State v. Goodbier, 367 So.2d 356, 357 (La.1979)(declining to reverse when record did not include transcript of voir dire examination and court reporter's affidavit indicated that no objections were made by the attorneys during voir dire)); see also State v. Lyons, 597 So.2d 593 (La.App. 4 Cir.1992)(declining to reverse when record did not include some of the jury charges, transcript of voir dire, impaneling of jury or opening statement). Third, and "[f]inally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts." Frank, supra (citing State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773)). Clearly, the record omission in this case does not satisfy this test.