956 So.2d 650 (2007)
STATE of Louisiana
v.
Shane A. FALCON.
No. 06-KA-798.
Court of Appeal of Louisiana, Fifth Circuit.
March 13, 2007.
*652 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, James W. Adair, Trial Counsel, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Frederick J. Kroenke, Jr., Louisiana Appellate Project, Baton Rouge, LA, for Defendant/Appellant.
Shane Falcon, Jackson, LA, pro se.
Panel composed of Judges EDWARD A. DUFRESNE, JR., WALTER J. ROTHSCHILD, and GREG G. GUIDRY.
GREG G. GUIDRY, Judge.
The Defendant, Shane Falcon, appeals his conviction for solicitation to commit second degree murder of his estranged wife, in violation of La.R.S. 14:28.1, and his sentence of 17 years imprisonment at hard labor. We affirm the conviction, vacate the sentence and remand for further proceedings consistent with this opinion.
The Defendant was charged with the offense in October 2002. He pleaded not guilty, and not guilty by reason of insanity. The State subsequently amended the bill of information to charge different dates of the offense, the Defendant maintained his pleas, and a sanity commission was appointed. In May 2004, the Defendant and the State stipulated to the sanity commission report finding the Defendant legally sane at the time of the offense. Following a jury trial in March 2005, the Defendant was found guilty as charged.
On May 16, 2005, the Defendant filed motions for post-verdict judgment of acquittal and new trial.[1] The Defendant was then sentenced. He orally made a motion to reconsider the sentence, which was denied. The Defendant subsequently appealed.
In November 2001, Penny Falcon filed for divorce from the Defendant, her husband of 20 years. In March 2002, she obtained a protective order against the Defendant. In June, while the protective order was still in effect, Ms. Falcon discovered the Defendant crouching behind her vehicle when she exited a fitness center. The Defendant was arrested. He was incarcerated for approximately ten days.
While in jail, the Defendant met Billy Jackson. Jackson had prior theft convictions, but had also worked as a paid police informant in Texas between 1995 and 1999. According to Jackson, the Defendant often mentioned that he wished he could pay someone to have his wife killed, because he had worked all his life for everything he had and did not want his wife to take half of it in the divorce proceedings. He also believed that she was having an affair. He made these comments in front of other inmates. Although the Defendant did not name a price he would be willing to pay, one of the men in their cell mentioned $12,000. The Defendant commented that $12,000 was too much.
Jackson saw this situation as an opportunity to make money at the Defendant's *653 expense. He led the Defendant into believing that he might be able to help the Defendant find someone to kill Ms. Falcon. Before his release, the Defendant gave Jackson his contact numbers. After his release, the Defendant helped Jackson make telephone calls to Jackson's daughter and his former girlfriend, Kimberly Robertson, through a three-way telephone call process. Robertson and Jackson had worked together as paid informants in Texas.[2] Jackson testified that he had no intention of actually helping the Defendant kill his wife, nor was it his intent to get the police involved.
Jackson wrote letters to Robertson telling her about the Defendant and his desire to have his ex-wife killed. He also outlined his own plan to make money by making the Defendant think he was going to help him with his ex-wife's murder. Jackson told Robinson not to contact Detective Matt Parrish, the Texas police officer with whom he and Robertson had worked as paid informants, about this scheme. Jackson also promised to give the money he received from the Defendant to Robertson. He urged her to assist in the plan to coerce money out of the Defendant by mentioning in one of the three-way telephone calls that Jackson owed her $600 for child support.
Jackson testified that the Defendant continued to talk about finding someone to kill Ms. Falcon during the three-way telephone conversations he had with Robertson. In the last call between the three, Jackson told the Defendant that a man named Joe (a fictitious name) could do it. However, nothing further was said as the prison terminated the call. Jackson was not contacted again by the Defendant. He later discovered the Defendant was in jail on the current charge.
Robertson testified at trial and indicated that she initially did not believe that the situation was real. However, she later realized the Defendant was in fact serious in his intentions to have Ms. Falcon murdered. In addition, the Defendant left her a message with a code to pick up money at a Western Union office. She believed the Defendant sent the money to give to the fictitious Joe as payment for him to come to New Orleans to kill the Defendant's wife.[3] After realizing the Defendant really intended to hire a contract killer, she contacted Detective Parrish. He advised her to pick up the money. Robertson picked up a $100 money order from Western Union on August 3, 2002. The receipt showed it was sent from "Shane Falcon" in Kenner, Louisiana. Robertson turned over the money to Detective Parrish.
Detective Parrish contacted the federal authorities. The case was eventually assigned to Detective Robert McGraw of the Kenner Police Department. An operation was set up in which Kenner police officer Lieutenant Glen Synigal agreed to pose as the hit man named Joe.
On Friday, August 9, 2002, the Lieutenant telephoned the Defendant, identifying himself as Joe from Texas. He told the Defendant that he was in Kenner, and wanted a photograph of the Defendant's ex-wife as well as her home and work addresses. The two men met in a local discount store parking lot.
During the first meeting between the two men, the Defendant gave the Lieutenant *654 Ms. Falcon's name, home and work addresses, car description, and work schedule. He also offered to show Lieutenant Synigal where she lived. He showed the officer a photograph, but did not give it to him, because it also included his children. They discussed the best possible location and method for the murder, including the possibility of disguising it as a robbery near Ms. Falcon's work. The Defendant also suggested that they wait approximately three weeks, because the Defendant expected to obtain favorable results for his child custody schedule within that time. The Defendant worried that the death would appear suspicious if it occurred before the court date.
During the negotiations about payment, the Defendant appeared nervous and upset. He explained to the Lieutenant that Jackson was initially supposed to do the job, but later changed his mind, claiming he had a friend that owed him a favor that would do it instead. The Defendant continuously complained that he did not want to talk to Joe and did not want to know any details of the murder.
At points during the conversation, the Defendant stated that he was afraid. He also expressed doubts about going through with the job. However, it was clear that his true concern was being caught and going back to jail. He justified his actions to the Lieutenant by telling him that his wife was going to take everything in the divorce. After the Defendant indicated some uncertainty, the Lieutenant told him that it was up to the Defendant to decide his intention. Instead of withdrawing from discussions, the Defendant resumed negotiations over the price.
The Lieutenant told the Defendant that he wanted $11,000. The Defendant complained that he had already invested approximately $2,000 in the deal, including $500 he paid to Jackson's lawyer, and the money for clothing he sent to Jackson in jail. The Lieutenant agreed to settle for $5,000, $2,000 in advance. In an attempt to raise the payment, the Lieutenant questioned whether the Defendant would get any life insurance proceeds as a result of the death. The Defendant was unsure, but agreed to pay the Lieutenant another $5,000 if he received any. After further negotiations, the advance payment was reduced to $1,000. The Lieutenant concluded that he would take care of the job if the Defendant was still agreeable. The Defendant promised to get the advance money to pay him.
Several days later, Lieutenant Synigal telephoned the Defendant to ask once again for a photograph, and for the down payment, explaining that he received money for living expenses while in town. During that conversation, the Lieutenant asked the Defendant if he had changed his mind. He asked the Defendant if he still wanted to go through with it. The Defendant answered, "[I] imagine so." Another meeting was scheduled.
At the next meeting, the Defendant gave the Lieutenant $200 in cash, promising to pay the rest of the money the following day. The two men again discussed the timing and manner of the killing. The Defendant also described Ms. Falcon once again and provided directions to her home. The Lieutenant pressed the Defendant for more money. The Defendant responded that he might be able to get more later on, but could not pay right away because after the murder he expected to have expenses related to the death including the burial. The Lieutenant asked if the Defendant had changed his mind since their last meeting. The Defendant responded that he was ". . . leery about it but it's the only way I think I can get back on my feet." The Defendant was then arrested.
*655 The medical evidence related to the Defendant's mental condition showed that the Defendant had been treated for depression from December 2001 to July 2002. The Defendant had been hospitalized for two weeks following a treatment session in which the Defendant was crying and out of control. However, Dr. Richard Richoux, a psychiatrist and member of the sanity commission who examined the Defendant, testified that the Defendant knew the difference between right and wrong at the time of the offense.
The Defendant presented several character witnesses at trial. His mother and Ms. Falcon's sister all testified that the Defendant was not violent and had never abused Ms. Falcon.
The Defendant testified in his own defense. He claimed that the idea of killing Ms. Falcon originated with Jackson, who told the Defendant that he would do the Defendant a favor by having Joe murder Ms. Falcon. The Defendant asserted that Jackson told the Defendant what to say to Joe. The Defendant said he thought Jackson was joking. Nevertheless, he met with Joe. The Defendant claimed that he was afraid of Joe. He insisted that he only went along with Joe, because he thought Joe was armed. According to the Defendant, he thought he would have time to back out of the deal if he did not give Joe the entire down payment. He said he intended to cut off contact with Joe during a telephone conversation. The Defendant said that he was not thinking clearly during this time, but did not want his wife killed.
On appeal, the Defendant asserts that the State failed to prove beyond a reasonable doubt that the Defendant was predisposed to commit the crime, that the trial judge erred in imposing an unconstitutionally excessive sentence, and that the trial court erred in its jury instruction on entrapment.[4]
1) Predisposition to commit the crime
La.R.S. 14:28.1 defines solicitation of murder as "the intentional solicitation by one person of another to commit or cause to be committed a first or second degree murder."
On appeal, contentions of entrapment are reviewed according to the constitutional standard for testing the sufficiency of the evidence as set out in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Petta, 98-745, pp. 7-8 (La.App. 5th Cir.2/10/99), 729 So.2d 29, 32; writ denied, 99-0692 (La.9/3/99), 747 So.2d 533, cert. denied, 528 U.S. 1125, 120 S.Ct. 956, 145 L.Ed.2d 830 (2000); State v. Bates, 03-352, p. 4 (La. App. 5th Cir.7/29/03), 853 So.2d 71, 74; writ denied, 03-2565 (La.2/6/04), 865 So.2d 740.
Under Jackson, the evidence is sufficient if the conviction was based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319, 99 S.Ct. at 2789; State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Polizzi, 05-478, p. 9 (La.App. 5th Cir.2/14/06), 924 So.2d 303, 310; Bates, 03-352 at p. 4, 853 So.2d at 74.
Entrapment is a defense that arises when a law enforcement official, or a *656 person acting in cooperation with such an official for the purpose of obtaining evidence of a crime, originates the idea of the crime, and then induces the person to engage in conduct constituting the offense when that person is not otherwise disposed to do so. State v. Brand, 520 So.2d 114, 117 (La.1988); Bates, 03-352 at p. 4, 853 So.2d at 74. However, it is not entrapment if the officers or agents have merely furnished a defendant who is predisposed to commit the crime the opportunity to do so. As stated by the Louisiana Supreme Court, "In entrapment cases, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." Brand, 520 So.2d at 116; Bates, 03-352 at p. 5, 853 So.2d at 74.
The first inquiry is whether the defendant proved by a preponderance of the evidence that he was induced by an agent of the government to commit the crime. If so, the next inquiry is whether the State adduced evidence of the defendant's predisposition to commit the crime such that a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have concluded that it was the defendant's predisposition to commit the crime, rather than the state's inducement that caused the defendant's conduct. Bates, 03-352 at p. 5, 853 So.2d at 74.
The evidence in this case shows the Defendant failed to establish by a preponderance of the evidence that he was induced by a government agent to solicit murder. There is no evidence that either Jackson or Robertson had been an informant for anyone in Louisiana, were working on behalf of any governmental agency when these events transpired, or induced the Defendant to commit the crime. Jackson testified that the Defendant repeatedly stated that he wished he could pay someone to kill his wife. The recorded tapes and the Lieutenant's testimony reflect the Defendant wanted his wife killed. He only hesitated once or twice when he feared that he would get caught and sent back to jail. Furthermore, Lieutenant Synigal provided several opportunities for the Defendant to change his mind, but the Defendant chose to continue with the plan.
In support of his position that he was entrapped, the Defendant points out that Jackson testified that the money sent to Robertson in Texas was for school supplies for Jackson's daughter. The Defendant also asserts in support of his argument that the tapes show that he did not know about Joe. However, there is nothing in the evidence that supports the Defendant's arguments.
The evidence shows that Jackson told the Defendant about Joe before the Lieutenant, acting as Joe, contacted him. The Defendant knew that the $100 he paid to Jackson was for Joe to come to Louisiana. He did not know Joe personally, but he understood that Jackson arranged for Joe to kill his wife. He did not want to meet with Joe, because he wanted to disassociate himself from the crime. Nevertheless, he voluntarily met with Joe on two occasions, and spoke to him on the telephone, concerning how the murder was to be accomplished and how much it would cost. He was reluctant to pay Joe's asking price, because he had already paid $2,000 on Jackson's behalf, and envisioned other expenses following Ms. Falcon's death.
In returning the guilty verdict, the jury obviously rejected the entrapment defense. The question of whether a government agent induced an innocent person into committing a crime is a jury question. State v. Hardy, 98-25, p. 9 (La.App. 5th Cir.5/13/98), 715 So.2d 466, 471. Furthermore, the trier of fact determines the credibility of witnesses, and within the bounds of rationality, may accept or reject the testimony. State v. Deruise, 98-0541, *657 p. 26 (La.4/3/01), 802 So.2d 1224, 1243, cert. denied, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001). It is not the function of the appellate court to assess credibility or reweigh the evidence. Bates, 03-352 at p. 7, 853 So.2d at 75.
Lieutenant Synigal merely provided an opportunity in this case for the Defendant to commit a crime that he was obviously predisposed to commit. Thus, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the Defendant's predisposition, independent of governmental action, caused him to solicit murder.
2) Jury Instruction
The Defendant contends that the trial judge gave an erroneous jury instruction requiring a reversal of his conviction. His position is that the judge failed to tell the jury that once the Defendant met his burden of proving he was induced to commit the crime, the burden shifted to the State to prove beyond a reasonable doubt that the Defendant was predisposed to commit the crime.
The record reflects that the trial judge gave the jury instructions to the State and the Defendant for their review early in the trial. On the last day of trial, during a break between witnesses in the Defendant's case-in-chief, the trial judge asked the attorneys to confirm that the instructions were acceptable. There were no objections. The trial judge later instructed the jury on entrapment as follows:
The defendant has raised the defense of entrapment so I will now instruct you on that defense. A defendant who is instigated or induced by a law enforcement officer, or someone acting for a law enforcement officer, into the commission of a crime which he otherwise had no intention of committing is not guilty because he was entrapped. Entrapment is shown when it appears that an officer, or someone acting for an officer, instigated the defendant to commit an offense which the defendant otherwise would not have committed and had no intention of committing. The burden is upon the defendant to prove the defense of entrapment by a preponderance of the evidence. It is not entrapment if the defendant already had the requisite criminal intent and the officer, or someone acting for the officer, merely furnished the defendant with the opportunity to commit the offense. The fact that an opportunity is furnished or that the defendant is aided in the commission of a crime which he was predisposed to commit or originated in his own mind is no defense. There is a clear distinction between inducing a person to commit a crime and setting a trap to catch a person in carrying out criminal designs of his own conception. The primary emphasis is on whether or not the defendant had a predisposition to commit the crime. Thus, if you find 1) that the defendant did not have an intent to commit the offense charged before being instigated to commit it; and 2) that the defendant was instigated to commit the offense charged by a law enforcement officer, or by someone acting as the officer's agent; then you must find the defendant not guilty.
After the jury retired to deliberate, the trial judge and the attorneys were discussing a point of law when the Defendant's attorney stated that he just discovered that the jury instructions failed to state that after the Defendant proves entrapment by a preponderance of the evidence, the burden shifts back to the State to prove beyond a reasonable doubt that the person was not entrapped. The judge found the objection to be untimely.
*658 La.C.Cr.P. art. 801(C) states that a party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection is made before the jury retires or within such time as the court may reasonably cure the alleged error. Thus, a defendant must make a timely objection under La.C.Cr.P. art. 801 in order to preserve a jury charge issue for review.
The Fourth Circuit addressed the issue of the judge's failure to include the State's burden of proof on entrapment in State v. Simpson, 01-1850, pp. 12-13 (La.App. 4th Cir. 10/16/02), 829 So.2d 650, 658-659. There, the instruction was deemed adequate because the charge clearly advised the jury of the two elements of entrapment  inducement and predisposition  and adequately advised the jury that if the defendant had no predisposition to commit the crime but was enticed by the State to do so, he could not be convicted. Simpson, 01-1850 at pp. 12-13, 829 So.2d at 659. The Simpson court further found that the trial judge properly declined to include the instruction on the burden of proof, based on United States v. Braver, 450 F.2d 799, 805 (2nd Cir.1971), cert. denied, 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972), where the Court cautioned, albeit in dicta, that an entrapment instruction should not contain references to the burdens of proof. Simpson, 01-1850 at p. 13, 829 So.2d at 659.
There are exceptions to the contemporaneous objection rule. In State v. Williamson, 389 So.2d 1328, 1331 (La.1980), the Court addressed the issue of erroneous jury instructions even though the Defendant failed to object timely, because the error related to the very definition of the crime of which defendant was convicted, and was of such importance and significance as to violate fundamental requirements of due process.
An error that is not structural does not necessarily violate fundamental due process, and thus, the defendant must make a contemporaneous objection in order to preserve the error for direct review. State v. Hongo, 96-2060, p. 4 (La.12/02/97), 706 So.2d 419, 422, ftn. 3. In addition, all constitutional errors are not structural and are subject to the harmless error analysis. Hongo, 96-2060 at p. 6, 706 So.2d at 421. Harmless error can be applied even to an invalid instruction on the elements of the crime if the evidence is otherwise sufficient to support the jury's verdict, and the jury would have reached the same result if it had never heard the erroneous instruction. Id. The Louisiana Supreme Court has stated that Williamson did not jurisprudentially create a "plain error" rule. State v. Howard, 98-0064, p. 18 (La.4/23/99), 751 So.2d 783, 804, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999).
This Court has reviewed alleged jury errors in the absence of a contemporaneous objection based on Williamson. In State v. Hollins, 99-278, p. 17 (La.App. 5th Cir.8/31/99), 742 So.2d 671, 683, writ denied, 99-2853 (La.1/5/01), 778 So.2d 587, we found the jury charge relative to requisite intent was incorrect, but the error did not require reversal as the jury instructions as a whole correctly stated the law. In State v. Smith, 05-951, p. 16 (La.App. 5th Cir.6/28/06), 934 So.2d 269, 279-280, we found that the trial judge's clarification of the definition of one of the elements of the crime by reference to Black's Law Dictionary was not error, as the charges taken as a whole correctly charged the jury.
We declined to address the issues in State v. Young, 99-1054, p. 12 (La.App. 5th Cir.2/16/00), 757 So.2d 797, 803, and State v. Gardner, 05-62, p. 14 (La.App. 5th Cir.6/28/05), 907 So.2d 793, 801. In Young, we refused to address the issue in the absence of a contemporaneous objection *659 where the complained of charge was not a misstatement of law. Likewise, in Gardner, we concluded that the defendant was precluded from raising the issue of an erroneous jury instruction on appeal without an objection. But, nevertheless, we found that the alleged error was harmless, as it did not contribute to the jury's verdict of guilty.
In State v. Garrison, 400 So.2d 874 (La. 1981), an instruction on entrapment similar to the one given in this case, was found by the Louisiana Supreme Court to have adequately instructed the jury.[5]
In the instant case, the language of the instruction is identical to the jury instruction approved by the Louisiana Supreme Court in Garrison. Furthermore, the instruction recites the correct law as a whole. Thus, we find no error in the trial judge's refusal to consider the objection.
Moreover, even if the jury instruction should have instructed the jury on the shifting burden of proof, the error was harmless. As already discussed, the police officer, posing as a hit-man, merely provided an opportunity for the Defendant to commit a crime he was predisposed to commit. The evidence was sufficient to support the jury's verdict, and the jury would have reached the same result if it had never heard the erroneous instruction. Thus, the guilty verdict was surely unattributable to any alleged error in the trial judge's failure to include a reference to the State's burden to prove predisposition.
3) Excessive sentence
The Defendant contends that his sentence is excessive because he is a first offender and he had no history of violent crime.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Smith, 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Lobato, 603 So.2d 739, 751 (La. 1992). Even though a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. Smith, 01-2574 at p. 6, 839 So.2d at 4.
The trial judge is afforded wide discretion in determining a sentence and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed, even when the trial judge does not provide reasons for the sentence. State v. Polizzi, 05-478, p. 16 (La.App. 5th Cir.2/14/06), 924 So.2d 303, 313, writ den. 06-1052 (La.11/3/06), 940 So.2d 660. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. Polizzi, 05-478 at p. 17, 924 So.2d at 314.
In this case, the record reflects in chilling detail the Defendant's actions in hiring what he believed to be a hit-man to murder Ms. Falcon, his former wife of 20 years and the mother of his children. Thus, we find that the record supports the sentence imposed.
4) Error Patent
The record was reviewed for patent errors in accordance with La.C.Cr.P. *660 art. 920. State v. Oliveaux, 312 So.2d 337, 338 (La.1975); Polizzi, 05-478 at p. 18, 924 So.2d at 315. We find one patent error.
There is a discrepancy between the sentencing transcript of May 16, 2005, and the commitment relative to the motions for new trial and post-verdict judgment of acquittal. The commitment reflects that the trial judge denied the motions for new trial and for post-verdict judgment of acquittal, but the transcript does not so reflect. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
Furthermore, the record does not clearly reflect that the trial judge denied these motions in writing. The order attached to the motion for new trial is unsigned and it is not clear that the trial judge signed the order attached to the motion for post-verdict judgment of acquittal. Rather, the word "Denied" is written across the motion, with the notation "5/16/05 See Commitment." In State v. Beaudoin, 06-88, p. 3 (La.App. 5th Cir.6/29/06), 939 So.2d 428, 429, this Court held that a written motion with the word "Denied" written across it and initialed by an unknown person obviously not the trial judge, did not constitute a final judgment. Thus, we find there is no ruling on either motion.
La.C.Cr.P. art. 821 provides that a defendant may move for a post-verdict judgment of acquittal following the verdict, and that such motion must be made and disposed of prior to sentencing. La. C.Cr.P. art. 853 provides the same with regard to motions for a new trial. The absence of rulings is reviewable as a patent error.[6]State v. Christian, 05-635, p. 3 (La.App. 5th Cir. 2/3/06), 924 So.2d 266, 267; State v. Randolph, 409 So.2d 554, 555 (La.1981).
In State v. Lewis, 04-1074, pp. 12-13 (La.App. 5th Cir.10/6/05), 916 So.2d 294, 301-302, writ denied, 2005-2382 (La.3/31/06), 925 So.2d 1257, the trial court erred in failing to rule on defendant's timely filed motion for post-verdict judgment of acquittal and motion for new trial. In conformity with Randolph, the Lewis court affirmed the defendant's convictions and finding as a second felony offender, vacated defendant's sentences, and remanded the case to the trial court for a ruling on the motions, reserving to defendant his right to re-institute his appeal from his convictions and sentences in the event that the rulings were adverse to him.
In conformity with Lewis, we will affirm the Defendant's conviction, vacate the sentence, and remand for a ruling on the post-trial motions and for resentencing in the event that the motions are denied. We will reserve to the Defendant the right to appeal from any adverse rulings. See also, State v. Morgan, 05-529 (La.App. 5th Cir.12/12/06), 948 So.2d 199.
Accordingly, the Defendant's conviction is hereby affirmed. His sentence is vacated and the case is remanded for a hearing on the motion for post verdict judgment of acquittal and motion for new trial, and for re-sentencing, if the motions are denied. In the event that the rulings on the motions are adverse to the Defendant, we hereby reserve his right to appeal from those rulings.
CONVICTION AFFIRMED, SENTENCE VACATED, AND CASE REMANDED.
NOTES
[1] The record does not show that the trial judge ruled on either of these motions. This omission is discussed in the error patent section.
[2] Robertson referred to herself as Kimberly Jackson at trial, but her legal name is Kimberly Carol Robertson. She had prior misdemeanor convictions.
[3] The taped telephone conversations, voice mail messages from Ms. Jackson's telephone, and the conversations between the Lieutenant and the Defendant were recorded, transcribed and produced for the jury at trial.
[4] The Defendant does not argue that the State failed to establish the essential elements of the crime of solicitation of murder.
[5] The jury instruction approved by the Garrison court is the basis for the model jury instruction on entrapment. See 17 Cheney C. Joseph, Jr. and P. Raymond Lamonica, Louisiana Civil Law Treatise: Criminal Jury Instructions § 6.24 (1994).
[6] The record does not clearly reflect that the motions were filed before sentencing. But, it does reflect that they were filed on the day of sentencing at 8:58 a.m.